1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

11    ELBERT THOMAS MARTIN,       )    Case No. EDCV 08-0827-SJO (JTL)

12                Plaintiff,       )    MEMORANDUM AND ORDER

13             v.                  )    DISMISSING SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND

14    M. ROCHE, et al.,             )

15             Defendants.    )

16 _____ )

17       On November 19, 2007, Elbert Thomas Martin ("plaintiff"), proceeding <u>pro se</u> and <u>in</u>

18 <u>forma pauperis</u>, filed a Complaint pursuant to 42 U.S.C. Section 1983 ("Complaint") in the

19 United States District Court for the Eastern District of California.  On June 20, 2008, the District

20 Court for the Eastern District issued an order transferring the claims arising in this judicial

21 district to this Court.

22       On July 11, 2008, the Court dismissed the Complaint, with leave to amend, pursuant to

23 the screening provisions of the Prison Litigation Reform Act of 1995 ("PLRA").  On August 13,

24 2008, plaintiff filed a First Amended Complaint.  The Court dismissed the First Amended

25 Complaint, with leave to amend, on September 8, 2008.  Plaintiff filed a Second Amended

26 Complaint on October 24, 2008.

27       In accordance with the terms of the Prison Litigation Reform Act of 1995 ("PLRA"), the

28 Court has screened the Second Amended Complaint before ordering service to determine

1   whether the action (1) is frivolous or malicious; (2) fails to state a claim on which relief may be

2   granted; or (3) seeks monetary relief against a defendant who is immune from such relief.  See

3   28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); 42 U.S.C. § 1997e(c)(1).

4        The Court's screening of plaintiff's Second Amended Complaint under the foregoing

5   statutes are governed by the following standards.  A complaint may be dismissed as a matter

6   of law for failure to state a claim for two reasons: (1) the plaintiff fails to state a cognizable legal

7   theory or (2) the plaintiff has alleged insufficient facts under a cognizable legal theory.  Balistreri

8   v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  Because plaintiff is appearing pro

9   se, the Court must construe the allegations of the Complaint liberally and must afford plaintiff

10  the benefit of any doubt.  See Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623

11  (9th Cir. 1988).  Moreover, in determining whether a complaint states a claim on which relief

12  may be granted, allegations of material fact are taken as true and construed in the light most

13  favorable to the plaintiff.  Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1989).  A pro se

14  litigant must be given leave to amend his or her complaint unless it is absolutely clear that the

15  deficiencies of the complaint cannot be cured by amendment.  Noll v. Carlson, 809 F.2d 1446,

16  1448 (9th Cir. 1987).

17       After careful review and consideration of the Second Amended Complaint under the

18  relevant standards, and for the reasons discussed below, the Court finds that plaintiff has failed

19  to state a claim upon which relief may be granted and **ORDERS** the **SECOND AMENDED**

20  **COMPLAINT DISMISSED WITH LEAVE TO AMEND.**

21

22                    **ALLEGATIONS OF THE SECOND AMENDED COMPLAINT**

23       Plaintiff's claims arose while he was incarcerated at the California Men's Colony ("CMC")

24  in San Luis Obispo, California.  (Second Amended Complaint ¶ 1).  Plaintiff asserts claims

25  against the following defendants in their individual capacities: John Doe No. 3, correctional

26  sergeant; John Doe No. 4, correctional officer; John Doe No. 5, correctional officer; T. Cook,

27  facility captain; S. Stack, chief psychiatrist; Dr. Donald A. Ramberg; Dr. Robert Meyers, health

28  care manager; D.L. England, correctional officer; and B.G. Dieball, correctional sergeant.

1  (Second Amended Complaint, Parties, ¶¶ 1-9).  Plaintiff also asserts claims against Dr. Meyers

2  in his official capacity.  (See Second Amended Complaint, Parties, ¶ 7, Relief, at 14).

3        Plaintiff alleges that he was transferred to CMC on November 27, 2006.  (See Second

4  Amended Complaint ¶ 1).  Plaintiff was placed in administrative segregation because he was

5  suspected of manipulating the locking bar mechanism of his cell door at the California Training

6  Facility ("CTF").  (Id., Exh. A).   Upon arrival, plaintiff was interviewed by Dr. Viggianelli.

7  (See id. at ¶¶ 2, 3).  Dr. Viggianelli reviewed plaintiff's medical chart and saw that plaintiff was

8  scheduled to have back surgery within two weeks, and issued plaintiff a "chrono" for a "lower

9  bunk/lower tier" housing assignment.  (Id. at ¶ 3, Exh. B).

10        On November 28, 2006, at 6:00 p.m., plaintiff asked to see a psychiatric technician.  (Id.

11  at ¶ 4).  The psychiatric technician arrived at plaintiff's cell half an hour later, and asked plaintiff,

12  "What seems to be the problem[?]" (Id.).  Plaintiff responded, "I don't know what the hell I'll do."

13  (Id.).  Plaintiff was then handcuffed and taken to the psychiatric ward, along with his medical

14  files.  (Id. at ¶¶ 4, 5).  Plaintiff alleges that he was on "CCCMS-status" from 2002 to 2006 and

15  was taking medication for depression.  (Id. at ¶ 4).  According to plaintiff, his medical file

16  included information that he had been prescribed medication for his bulging disc pain in his

17  lower back, asthma, and high blood pressure.  (See id. at ¶ 4, Exh. C).

18        Upon arrival at the psychiatric ward, plaintiff was placed in a cell while his medical

19  records were reviewed by defendant Stack, the chief psychiatrist.  (Id. at ¶ 6).  Plaintiff alleges

20  that, before patients are admitted to the psychiatric ward, their medical records are reviewed

21  to assess mental needs, such as possible depression or re-lapse, as well as physical needs by

22  way of chronos.  (Id.).

23        Plaintiff was then told to take off all of his clothes and that he would have to sleep on the

24  upper bunk, without his clothes, a mattress, or a blanket for the next 72 hours.  (Id. at ¶ 7).

25  Plaintiff then asked to see defendant Stack.  (Id.).  Plaintiff was told that defendant Stack had

26  already reviewed plaintiff's medical chart and would see plaintiff only after a 72-hour

27  observation period, and not to "get upset, because the doctor has already seen your records."

28  (Id. at ¶¶ 7, 8).

Over the next 72 hours, plaintiff complained that his right testicle and right leg had swollen because he had been sleeping on bare metal without any blankets or clothes, and had not received any of his medications.  (Second Amended Complaint ¶ 9).

On December 2, 2006, plaintiff told a staff nurse that he was hearing voices and wanted to see a doctor.  (Id. at ¶¶ 10, 12).  An officer standing next to the nurse informed plaintiff that he would be seeing the "psych. committee in a little while, so just hang in there."  (Id. at ¶ 11).  Plaintiff was taken to see the psychiatric committee, headed by defendant Stack, that day.  (Id. at ¶ 12).  Defendant Stack told plaintiff that he felt plaintiff was "O.K. at this point" and would be returned to administrative segregation, where he would be subject to hourly observation for the next ten days, i.e., every hour, on the hour, plaintiff would have to show a correctional officer some type of physical movement.  (Id.).  Plaintiff told defendant Stack that he was hearing the same voices he had heard around September 2002, and that he was suffering from depression caused by being accused of committing a crime at the CTF.  (See id. at ¶ 13, Exh. D).

Plaintiff was then taken to an administrative segregation cell, where he informed defendants John Doe Nos. 3, 4, and 5 that he was a devout Muslim and required a Holy Quran, a towel to use as a prayer rug, because the cell floor was too dirty to pray on, and a kosher meal, or a peanut butter and jelly sandwich, because he did not eat meat.  (Id. at ¶ 14).  Plaintiff informed the officers that, if they checked plaintiff's central file, they would see that plaintiff was a registered Muslim and had a kosher meal card.  (Id. at ¶ 14, Exh. E).  Later in the day, defendants John Doe Nos. 4 and 5 brought plaintiff his evening meal, and plaintiff saw defendant John Doe No. 4 spit in the food.  (Id. at ¶ 15).  Defendant John Doe No. 5 told plaintiff to take the food tray, and plaintiff responded, "Not after you just spit in it."  (Id.).  Defendant John Doe No. 4 said, "Sure I did."  (Id. at ¶ 16).  Plaintiff asked to speak to the sergeant, defendant John Doe No. 3, who arrived a half hour later.  (Id.).  When asked what the problem was, plaintiff told defendant John Doe No. 3 that one of his officers had spit in his food tray, and that he was given a "meat tray" even after he advised the officers that he did not eat meat.  (Id.).  Plaintiff asked for a complaint form and defendant John Doe No. 3 said he would

1    look into it, but plaintiff never saw defendants John Doe Nos. 3, 4, or 5 again. (Second
2    Amended Complaint ¶ 16).

3         On December 7, 2006, plaintiff appeared before the Institutional Classification
4    Committee ("ICC"). (Id. at ¶ 17, Exh. D). Defendant Captain T. Cook asked plaintiff why he
5    was there, and told plaintiff that plaintiff's cellmate had already told the staff at the CTF that
6    plaintiff had nothing to do with what had taken place in his cell because plaintiff was on the yard
7    when the cell door mechanism had been compromised. (Id. at ¶¶ 18-19, Exh. D). Plaintiff said
8    that he had been transferred for something that his cellmate had done, he never had a chance
9    to tell his side of the story or produce witnesses on his behalf, or give a written statement before
10   he was transferred. (Id. at ¶ 20). Plaintiff said that other inmates had seen him as a role model
11   inmate and an upstanding Muslim, but had seen him in handcuffs, and that he had been put
12   through shameful and inhumane treatment since being transferred to CMC, such as
13   correctional officers spitting in his food, being assigned to an upper bunk when he was
14   scheduled for major back surgery, having his religion demeaned, and being "taken out of a
15   place where I was programming," just to be told that he had been cleared of all charges and
16   that he wold be dropped "from a level two points, to a level one." (Id.). Plaintiff said that he had
17   not been able to call his loved ones to let them know what was going on, because he had been
18   moved six times since his arrival at CMC on November 26, 2007. (See id.). Plaintiff said that
19   he never should have been sent to CMC in the first place, and was sent there under a false
20   allegation, and asked to leave. (Id.). Plaintiff was taken back to his cell, but remained in
21   administrative segregation for six more days. (Id. at ¶ 21).

22        On December 13, 2006, defendant correctional officer England came to plaintiff's cell
23   and told him that he had to get ready to go to the hospital for his back surgery. (Id. at ¶ 21).
24   Defendant England told plaintiff to strip down, so he could put on a paper jumpsuit, and plaintiff
25   complied. (Id.). Plaintiff inquired about the safe-keeping of his legal papers, and defendant
26   England told him that his cell would be left open for three or four days until he returned, and to
27   leave them in the cell. (Id. at ¶ 22). Plaintiff said that he would not be returning to that cell and
28   that his legal work contained information regarding the names, places, cells, and his

experiences since he had been at CMC, which he would use to file a lawsuit.  (See Second Amended Complaint ¶ 22).  Defendant England then told plaintiff to place his legal papers in a plastic bag, which he provided to plaintiff.  (Id. at ¶ 23).  Plaintiff placed the papers in the bag and tried to give it to defendant England, but defendant England refused to take it and directed plaintiff to leave it on the bookshelf.  (Id.).  Plaintiff did so, and was escorted out of the cell and transported to the hospital.  (Id.).  The staff was subsequently unable to locate plaintiff's legal papers.  (See id., Exh. F; see also id. at ¶¶ 57, 58, Exh. Z).

Plaintiff arrived at Sierra Vista Hospital around 10:00 a.m. on December 13, 2006, and was admitted and seen by defendant Dr. Ramberg.  (Id. at ¶ 23, Exhs. G, H).  Dr. Ramberg asked plaintiff if he was ready for surgery, and plaintiff said that he was not sure and hoped he would wake up and be able to walk.  (Id. at ¶¶ 23, 24).  Dr. Ramberg told plaintiff that he would only be going in on the right side of his back and look around and clean up some things, because the M.R.I. indicated that was where his disc was protruding, and that plaintiff would be fine and would not need surgery again.  (Id. at ¶¶ 26, 29, Exh. I).  Three or four hours after the surgery, Dr. Ramberg came in to see plaintiff and asked how he felt.  (Id. at ¶ 27).  Plaintiff asked Dr. Ramberg, "Why is my left leg killing me[?]" and explained that he felt pain coming from the left side of his back, down his left leg and to his left foot.  (Id.).  Dr. Ramberg then told plaintiff that, during the surgery, he had gone in on plaintiff's left side and looked around, and then moved to plaintiff's right side.  (Id. at ¶ 28, Exh. J).  Dr. Ramberg told plaintiff that he felt plaintiff needed a second surgery to fuse his disc; he did not fuse the disc during the first surgery because he needed plaintiff's consent, it was not life threatening, and they would wait to see how plaintiff healed.  (Id. at ¶ 28).  Plaintiff told Dr. Ramberg that he thought he would only need one surgery, and that he had never felt pain on his left side, but now his left side was just as bad as his right side.  (Id. at ¶ 30).  Dr. Ramberg told plaintiff, "It's just compensating for the other side[.] Don't worry[,] it will get stronger, just continue on your home medications and I will see you in 30-days[.]" (Id. at ¶ 31).  On December 15, 2006, plaintiff was discharged from the hospital with a back brace and medication prescribed by Dr. Ramberg.  (Id. at ¶¶ 32, 33, Exhs. K, L).  Plaintiff has not seen Dr. Ramberg since the surgery.  (Id. at ¶ 31).

1      Plaintiff was taken back to CMC and was admitted to the CMC hospital where Dr. Perry

2  examined plaintiff and asked him why Dr. Ramberg had operated while plaintiff was suffering

3  from lesions in his mouth, and suffered from asthma.  (Second Amended Complaint ¶¶ 34, 35,

4  Exh. M).  Dr. Perry said that he would have waited at least until plaintiff's lesions had healed.

5  (Id. at ¶ 35).

6      Plaintiff saw Dr. Perry again, on December 18, 2006, complaining about the unbearable

7  pain running from his lower back, down his left leg.  (Id. at ¶ 36, Exhs. N, P).  Dr. Perry

8  continued plaintiff's pain medication and told plaintiff to continue to use his walker.  (Id. at ¶ 37,

9  Exh. O).  Plaintiff was also seen by the physical therapist on December 18, 2006, and

10  continued to complain about the severe pain in his left leg.  (Id. at ¶ 38).

11      On December 19, 2006, plaintiff was assigned to housing in a level-3 yard.  (Id. at ¶ 39).

12  Plaintiff informed the desk correctional officer that the administrative segregation committee told

13  him he would be housed on the level-1 yard.  (Id. at ¶ 40).  On December 26, 2006, plaintiff filed

14  a "Reasonable Modification or Accommodation Request" under the Americans with Disabilities

15  Act ("ADA"), describing his disability as "chronic back pain" and "left leg has pain  running down

16  from hip to feet (back surgery)," and requesting a walking cane and a double or egg crate

17  mattress.  (Id. at ¶ 41, Exh. Q).  Plaintiff submitted his request to defendant Dr. Meyers.  (Id.

18  at ¶ 51).

19      On February 13, 2007, plaintiff received notice that his appeal regarding his lost legal

20  papers had been denied by defendant correctional sergeant B.G. Dieball.  (Id. at ¶ 43, Exhs.

21  F, R).  Plaintiff alleges that his requests for informal and formal level review were bypassed

22  without review.  (Id. at ¶ 43).

23      On February 20, 2007, plaintiff was transferred to the California Correctional Institution

24  in Tehachapi, California ("Tehachapi").  (Id. at ¶ 44).

25      On March 20, 2007, plaintiff filed another "Reasonable Modification or Accommodation

26  Request" under the ADA, describing his disability as "chronic back and spasms pain, leg pain,

27  intense pain in second toe on left foot," indicating that he had back surgery on December 13,

28  2006, and had been taken off pain medication, and requesting resumption of his pain

medication until he had back surgery again.  (See Second Amended Complaint ¶ 45, Exh. S).
On April 5, 2007, at the request of K. Sampson, appeals coordinator, plaintiff filed a CDC 602
appeal form, asking to be allowed to continue to take pain medication until July 18, 2007.
(Second Amended Complaint ¶ 46, Exh. T).

On April 16, 2007, Correctional Lieutenant K. Smith interviewed plaintiff as part of his
second level appeal regarding the loss of the legal papers he had left in his cell.  (See id. at ¶¶
47-49, Exh. U).  Plaintiff's appeal was denied on April 24, 2007.  (See id., Exh. U).

Plaintiff then received a response that his grievance concerning pain medication was
partially granted in that his pain medication would be resumed.  (Id. at ¶ 50, Exh. V).

On June 26, 2007, plaintiff was interviewed by K. Sampson regarding his request for a
walking cane and double or egg crate mattress.  (Id. at ¶ 51, Exh. W).  K. Sampson informed
plaintiff that his request had been partially granted.  (Id. at ¶ 51).  Plaintiff stated that he no
longer required the cane and mattress because six months had passed since he submitted the
request to defendant Dr. Meyers and the injury was healing.  (Id. at ¶¶ 51, 52, Exh. W).

On July 10, 2007, plaintiff had a video conference consultation with a neurosurgeon, who
told him that he needed another back surgery to correct the results of the first surgery, and that
a steel rod and fusing three discs would correct plaintiff's problems.  (Id. at ¶ 53, Exhs. X, Y).
Plaintiff asked the surgeon why Dr. Ramberg had not done this during the first surgery, and the
surgeon responded, "I would[n't] have do[n]e what he did."  (Id. at ¶ 54).  The surgeon told
plaintiff that the State had asked him to look at plaintiff's medical file, and told plaintiff that if he
did not have additional surgery, his problem could get worse.  (Id. at ¶ 55).  Plaintiff refused the
surgery.  (Id. at ¶ 56).

Plaintiff requested a second medical opinion about his back.  (Id. at ¶ 60).  The second
neurosurgeon said that he wanted to operate on plaintiff to fuse the discs in plaintiff's lower
back, and that plaintiff's chances of mobility were fifty-fifty.  (Id. at ¶¶ 61-64).  Plaintiff declined
the surgery.  (Id. at ¶ 65).

Plaintiff has since been issued a "Comprehensive Accommodation Chrono," indicating
that plaintiff requires housing in a ground floor cell, bottom bunk, a back brace and soft-sole

1   shoes, and cannot lift over ten pounds, stand for more than half an hour each hour, climb,

2   stoop, kneel, crouch or bend.  (Second Amended Complaint ¶ 66, Exh. BB).  Plaintiff also

3   asserts that he suffers from weight loss, high blood pressure, severe nerve damage in his lower

4   back which has caused him sexual deprivation, urine problems due to pinched nerves in his

5   back, and he cannot run at any speed, balance on either leg, or taste food properly.  (Id. at ¶

6   66).

7        Plaintiff asserts claims under the First, Eighth, and Fourteenth Amendments.  (Second

8   Amended Complaint, Legal Claims, at 13).  Plaintiff seeks compensatory and punitive damages

9   and injunctive relief directing defendants to refrain from using physical force against him and

10  from confiscating his legal books and papers.  (Second Amended Complaint, Relief, at 14).

11

12                                **DISCUSSION**

13  **I.    PLAINTIFF FAILS TO STATE AN EIGHTH AMENDMENT CLAIM BASED UPON**

14          **CONDITIONS OF HIS CONFINEMENT**

15       An Eighth Amendment claim challenging conditions of confinement must satisfy both

16  objective and subjective criteria.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  First, the

17  deprivation must be sufficiently serious to implicate the Eighth Amendment.  See id.  The

18  conditions of a prisoner's confinement amount to cruel and unusual punishment only if he has

19  been deprived of the "minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452

20  U.S. 337, 347 (1981).  Second, prison officials are liable for the deprivation only if they acted

21  with deliberate indifference to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S.

22  825, 828 (1994).  Deliberate indifference exists when "the official knows of and disregards an

23  excessive risk to inmate health or safety; the official must both be aware of the facts from which

24  the inference could be drawn that a substantial risk of serious harm exists and also draw the

25  inference."  Id. at 837.

26       Under the Eighth Amendment, prison officials must provide prisoners with food, clothing,

27  shelter, sanitation, medical care and personal safety.  See Farmer, 511 U.S. at 832.  The

28  circumstances, nature, and duration of a deprivation of these necessities must be considered

1   in determining whether a constitutional violation has occurred.  Johnson v. Lewis, 217 F.3d 726,

2   731 (9th Cir. 2000).  The more basic the need, the shorter the time it can be withheld.  See id.

3   at 732.  "More modest deprivations" can form the basis of a constitutional deprivation only if

4   they are lengthy or ongoing.  Johnson, 217 F.3d at 732.

5       Here, plaintiff alleges that he was deprived of his clothes, a mattress and a blanket

6   during a 72-hour observation period in the psychiatric ward.  (Second Amended Complaint ¶

7   7).  Plaintiff alleges that he complained that his right testicle and right leg had swollen because

8   he had been sleeping on bare metal without any blankets or clothes.  (Id. at ¶ 9).  As the Court

9   determined in its previous dismissal order, plaintiff's allegations that he was without a mattress

10  for three days, during a time in which he had back problems, was scheduled for back surgery,

11  and had been issued a "lower bunk/lower tier" chrono but had not been issued a lower bunk

12  (see id. at ¶¶ 3, 7, Exh. B), meet the objective criteria for an Eighth Amendment violation.

13      Plaintiff, however, has not alleged deliberate indifference on the part of any defendant.

14  A person "subjects" another to the deprivation of a constitutional right within the meaning of

15  Section 1983 if he or she "does an affirmative act, participates in another's affirmative acts, or

16  omits to perform an act which he [or she] is legally required to do" that causes the

17  complained-of deprivation.  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978); see also

18  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (Section 1983 liability requires personal

19  participation in deprivation).  Plaintiff does not allege that he complained of the swelling in his

20  right testicle or right leg to any defendant.  Nor does plaintiff allege that any defendant

21  personally determined that plaintiff should remain without a mattress, clothes or blanket for 72-

22  hours despite knowing of this swelling or plaintiff's back condition, or that any defendant was

23  aware of facts from which he could infer that plaintiff would face a substantial risk of serious

24  harm.  See Farmer, 511 U.S. at 837.  Thus, plaintiff has failed to allege an Eighth Amendment

25  claim against any defendant for deliberate indifference based on the failure to provide him with

26  a mattress, clothing or blanket.

27      Moreover, to the extent plaintiff alleges an Eighth Amendment violation based on

28  defendant John Doe No. 4 spitting into his food (see Second Amended Complaint ¶ 15),

deprivation of a single meal does not constitute an injury serious enough to support an Eighth Amendment claim.  See Hernandez v. Denton, 861 F.2d 1421, 1424 (9th Cir. 1988) (holding that allegation that inmate slept without a mattress for one night is insufficient to state an Eighth Amendment violation and no amendment could alter that insufficiency), judgment vacated on other grounds, Hernandez v. Denton, 493 U.S. 801 (1989); see also Glover v. Evans, 2007 WL 3022249, at *1 (N.D. Cal. Oct. 15, 2007) (failure to provide inmate with vegetarian meal in compliance with his special religious diet on a single occasion was not of constitutional magnitude).

Plaintiff, therefore, fails to allege Eighth Amendment claims based on the above described deprivations against any of the defendants.

## II.   PLAINTIFF FAILS TO STATE AN EIGHTH AMENDMENT CLAIM FOR INADEQUATE MEDICAL CARE

A violation of the Eighth Amendment occurs when prison officials are deliberately indifferent to a prisoner's medical needs.  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).  To establish an Eighth Amendment violation based on inadequate medical care, a prisoner must demonstrate that: (1) the prison official deprived the prisoner of the "minimal civilized measure of life's necessities" and (2) the prison official "acted with deliberate indifference in doing so."  Toguchi, 391 F.3d at 1057; see Estelle v. Gamble, 429 U.S. 97, 106 (1976) (a prisoner asserting a Section 1983 claim for denial of medical care must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs").  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837 (also stating that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A serious medical

need exists if failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Estelle, 429 U.S. at 104; McGuckin, 974 F.2d at 1059.  Finally, a delay in medical treatment generally amounts to deliberate indifference only if it leads to further injury.  See McGuckin, 974 F.2d at 1060 (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)).

Deliberate indifference requires that defendants purposefully ignore or fail to respond to the prisoner's pain or possible medical need.  McGuckin, 974 F.2d at 1060.  Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison physicians provide medical care."  Id. at 1059.  However, an inadvertent or negligent failure to provide medical care does not constitute deliberate indifference.  Estelle, 429 U.S. at 105-06.  "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429 U.S. at 106; see  Toguchi, 391 F.3d at 1057; Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

### A.    Lower Bunk and Medication

Plaintiff alleges that he was placed in a psychiatric ward cell for 72 hours and was told that he had to sleep on the upper bunk, without his clothes, a mattress or a blanket, and did not receive any of his medications. (Second Amended Complaint ¶¶ 7, 9).  Plaintiff has alleged that, at the time he was placed in the psychiatric ward cell, he had a "lower bunk/lower tier" chrono and was scheduled to have back surgery within two weeks.  (See id. at ¶¶ 3, Exh. B).  Thus, as the Court determined in its previous dismissal order, plaintiff's 72-hour placement in a cell without a lower bunk or a mattress implicated a serious medical need.  Plaintiff has also alleged that, upon his arrival at the psychiatric ward, defendant Stack, the chief psychiatrist, reviewed plaintiff's medical file, which indicated that plaintiff had received a chrono and had been prescribed medication for his bulging disc pain in his lower back, asthma and high blood pressure.  (See id. at ¶¶ 4-6, Exh. C).  Plaintiff also alleges that he was on "CCCMS-status"

from 2002 to 2006 and was taking medication for depression.  (Second Amended Complaint at ¶ 4).  Plaintiff alleges that he asked to see defendant Stack, but was told that defendant Stack had already reviewed plaintiff's medical records and would see plaintiff only after the 72-hour observation period.  (Id. at ¶¶ 7, 8).  Plaintiff alleges that he told a staff nurse that he was hearing voices, and told the psychiatric committee, headed by defendant Stack, that he was hearing voices and was suffering from depression.  (Id. at ¶¶ 10, 12, 13).

Construing the allegations of the Second Amended Complaint liberally and in the light most favorable to plaintiff, at the screening stage of this action, plaintiff's allegations fail to state an Eighth Amendment claim against defendant Stack, or any other defendant, with respect to his upper bunk assignment.  Plaintiff does not allege that any defendant assigned plaintiff to a cell with only an upper bunk, was otherwise aware of the upper bunk assignment, or knew that plaintiff had been told he would have to sleep on the upper bunk.  As to the alleged failure to provide plaintiff with his medication, plaintiff does not allege that defendant Stack, or any other defendant, knew that he was not receiving his medication.  Plaintiff, therefore, has not alleged an Eighth Amendment with regard to an alleged failure to provide plaintiff with a lower bunk or his medication.

### B.   Back Surgery

Plaintiff alleges that defendant Dr. Ramberg told plaintiff that he would only be operating on the right side of plaintiff's back, because that is where his M.R.I. indicated a protruding disc, and that plaintiff would not need another surgery, but nonetheless operated on the left side of plaintiff's back. (Second Amended Complaint ¶¶ 26, 28, 29, Exh. J).  Plaintiff also alleges that Dr. Ramberg told him he needed a second surgery to fuse his disc.  (Id. at ¶ 28).  According to plaintiff, he had never felt pain on his left side, but, after Dr. Ramberg operated on plaintiff, his left side felt as bad as his right side, and he had pain in his left back, leg and foot.  (Id. at ¶¶ 27, 30; see id. at ¶¶ 36, 38, Exhs. N, P).  Plaintiff also alleges that another physician, Dr. Perry, expressed surprise that Dr. Ramberg had operated on plaintiff while he had lesions in his mouth and suffered from asthma, and said that he would have waited at least until plaintiff's lesions had healed.  (Id. at ¶¶ 34, 35, Exh. M).  He further alleges that two neurosurgeons have

1   advised him that he needs a second surgery to correct the effects of the first surgery, and that
2   one of the surgeons stated that he "would[n't] have do[n]e what [Dr. Ramberg] did." (Second
3   Amended Complaint at ¶¶ 53-55, 60-64).

4          A difference of opinion between an inmate and medical staff, or among the inmate's
5   physicians, as to the nature of appropriate medical treatment is insufficient as a matter of law
6   to constitute deliberate indifference.  See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90
7   F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  To prevail
8   on a claim involving choices between alternative courses of treatment, a prisoner must show
9   that the chosen course of treatment was "medically unacceptable under the circumstances,"
10  and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health."
11  Toguchi, 391 F.3d at 1058 (quoting Jackson, 90 F.3d at 332).  This is a difficult standard to
12  meet.  See Toguchi, 391 F.3d at 1060 ("Deliberate indifference is a high legal standard.").
13  Nevertheless, as the Court concluded in its previous dismissal order, plaintiff's allegations are
14  sufficient to state an Eighth Amendment claim against Dr. Ramberg at the screening stage of
15  this action.

16         Plaintiff, therefore, may reallege his claim against Dr. Ramberg in his Third Amended
17  Complaint.

18         **C.    <u>Post-Surgery Care</u>**

19         On December 26, 2006, plaintiff submitted a "Reasonable Modification or
20  Accommodation Request" under the ADA to defendant Dr. Meyers, the CMC health care
21  manager, requesting a walking cane and a double or egg crate mattress.  (See Second
22  Amended Complaint ¶¶ 41, 51, Exhs. Q, W).  In his request, plaintiff described his disability as
23  "chronic back pain" and "left leg has pain  running down from hip to feet (back surgery)."  (Id.
24  at ¶ 41, Exh. Q).  Subsequently, on February 20, 2007, plaintiff was transferred to Tehachapi.
25  (Id. at ¶ 44).  Plaintiff was interviewed by K. Sampson regarding his request on June 26, 2007,
26  and indicated that he no longer required the cane and mattress because six months had
27  passed since he submitted the request and his injury was healing.  (Id. at ¶¶ 51, 52, Exh. W).
28  On June 26, 2007, Dr. Meyers partially granted plaintiff's appeal on the ground that plaintiff no

longer required the requested accommodations.  (See Second Amended Complaint at ¶¶ 51, Exh. W).

Although plaintiff does not explicitly contend in the Second Amended Complaint that defendants violated his Eighth Amendment rights when they failed to provide him with a walking cane and a double or egg crate mattress after his back surgery, an Eighth Amendment claim on this basis remains deficient.  As the Court noted in its previous dismissal order, although plaintiff may have had a serious medical need for a double mattress and a walking cane in the weeks after his back surgery, he has not alleged deliberate indifference on the part of Dr. Meyers, the CMC health care manager, or any other defendant.  Plaintiff has not alleged any facts in the Second Amended Complaint from which the Court could infer that Dr. Meyers, or any other defendant, knew of and purposefully disregarded plaintiff's serious medical need for a double mattress and/or a walking cane.  See McGuckin, 974 F.2d at 1060.

Plaintiff, therefore, fails to state an Eight Amendment claim based on the failure to provide him with a double mattress or walking cane.

**III.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE ADA AGAINST DEFENDANT DR. MEYERS**

Plaintiff's Second Amended Complaint does not assert a claim under the ADA.  (See Second Amended Complaint, Legal Claims, at 13).  Plaintiff, however, alleges that he submitted a "Reasonable Modification or Accommodation Request" under the ADA, requesting a walking cane and a double or egg crate mattress to Dr. Meyers on December 26, 2006.  (Id. at ¶¶ 41, 51, Exh. Q).  Plaintiff further alleges that Dr. Meyers partially granted his request on June 26, 2007, six months after plaintiff submitted his request and after his injuries were healing.  (Id. at ¶¶ 51, 52, Exh. W).  Plaintiff sues Dr. Meyers in both his individual and official capacity.  (See id., Parties, ¶ 7, Relief, at 14).

To the extent plaintiff intends to assert a claim that Dr. Meyers violated the ADA by failing to provide him with post-surgery accommodations including a walking cane and double mattress, plaintiff's allegations are insufficient to state a claim under the ADA.  Title II of the ADA prohibits public entities from discriminating on the basis of disability.  42 U.S.C. § 12132.

To assert a claim under the ADA, plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs or activities; (3) he was excluded or otherwise discriminated against by the public entity; and (4) the exclusion or discrimination occurred solely by reason of his disability.  Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002), cert. denied, 538 U.S. 921 (2003).  State prisons fall within the statutory definition of "public entity."  Pennsylvania Dep't of Corrs. v. Yeskey, 524 U.S. 206, 210 (1998).

Damages are not available under Title II of the ADA absent a showing of discriminatory intent.  See Duvall v. County of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001); Ferguson v. City of Phoenix, 157 F.3d 668, 674 (9th Cir. 1998).  The test for intentional discrimination under the ADA is deliberate indifference.  Duvall, 260 F.3d at 1138.  Deliberate indifference requires: (1) knowledge that a harm to a federally protected right is substantially likely; and (2) failure to act upon that likelihood.  Id. at 1139.  The first prong of the deliberate indifference test is satisfied when the plaintiff has alerted the entity to his need for an accommodation, or where the need for accommodation is obvious.  Id.  The second prong requires a failure to act that is more than negligent and involves an element of deliberateness.  Id.

Here, plaintiff, again, has failed to allege the requisite discriminatory intent necessary to support a claim for damages under the ADA.  Plaintiff does not allege that his request for accommodation was denied, but only that he was interviewed regarding his request six months after he submitted it, when he no longer needed the requested accommodations.  Plaintiff does not allege that he made any efforts to obtain a walking cane and double mattress, or to obtain an earlier decision on his request, during this six-month period.  Contrast Duvall, 260 F.3d at 1140 (defendants had notice of plaintiff's need for accommodation and despite his repeated requests failed to take the necessary action).  Moreover, plaintiff was transferred to another prison less than two months after he submitted his request.  (Second Amended Complaint ¶ 44).  Under these circumstances, plaintiff's allegations are not sufficient to show deliberate indifference, and, thus, discriminatory intent, on the part of Dr. Meyers, or any other defendant.  Duvall, 260 F.3d at 1138-39.

1    Accordingly, to the extent plaintiff purports to assert a claim under the ADA against Dr.

2  Meyers, the claim must be dismissed.

3    Moreover, although an ADA claim may be properly asserted against a defendant in his

4  official capacity, plaintiff cannot assert an ADA claim against an individual defendant in his

5  individual capacity.  See United States v. Georgia, 546 U.S. 151, 159 (2006) (Title II validly

6  abrogates state sovereign immunity insofar as it creates a private cause of action for damages

7  for conduct that violates the Fourteenth Amendment); Vinson v. Thomas, 288 F.3d 1145, 1156

8  (9th Cir. 2002) ("[A] plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State

9  official in [his or] her individual capacity to vindicate rights created by Title II of the ADA."), cert.

10 denied, 537 U.S. 1104 (2003).  Thus, to the extent plaintiff intends to assert an ADA claim

11 against Dr. Meyers, an individual-capacity ADA claim against Dr. Meyers would be dismissed.

12 **IV.    PLAINTIFF FAILS TO STATE A CLAIM UNDER THE FIRST AMENDMENT**

13    Plaintiff asserts a violation of his First Amendment right to free exercise of religion.

14 (Second Complaint, Legal Claims, at 13).

15    In order to establish a violation of his First Amendment right to free exercise of religion,

16 plaintiff must show that defendants burdened the practice of his religion by preventing him from

17 engaging in activities that he sincerely believes are mandated by his faith, without any

18 justification reasonably related to penological interests.  See Shakur v. Schriro, 514 F.3d 878,

19 884-85 (9th Cir. 2008).  In Shakur, the Ninth Circuit held that the prisoner is not required to

20 show objectively that the religious practice at issue is central to his faith; rather, the test is

21 whether the prisoner's belief regarding the practice is sincerely held and rooted in religious

22 belief.[1]  Shakur, 514 F.3d at 885 (finding that the district court impermissibly focused on

23 whether consuming Halal meat was a central tenet of Islam, rather than on whether plaintiff

24 sincerely believed that eating kosher meat was consistent with his faith).

25

26 _____

27    [1] Even if a restriction implicates an inmate's First Amendment right to free exercise of religion, it is constitutionally valid if it is reasonably related to legitimate penological interests.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89 (1987).  However, this is not a

28 matter for screening.

Here, plaintiff alleges that, when he was placed in administrative segregation on December 2, 2006, he informed defendants John Doe Nos. 3, 4, and 5 that he was a devout Muslim, he required a Holy Quran, a towel to use as a prayer rug, because the cell floor was too dirty to pray on, and a kosher meal, or a peanut butter and jelly sandwich, because he did not eat meat, and that his central file confirmed he was a registered Muslim and had a special religious diet card.  (Second Amended Complaint ¶ 14, Exh. E).  Plaintiff further alleges that defendants John Does Nos. 4 and 5 brought him a meat meal tray and John Doe No. 4 spit in the food.  (See id. at ¶¶ 15-16).  Plaintiff refused to take the food tray after he saw John Doe No. 4 spit in the food.  (Id. at ¶ 15).  Plaintiff, thereafter, informed defendant sergeant John Doe No. 3 that one of his officers had spit in the food tray, and that he was given a meat meal tray even after he had informed them that he did not eat meat.  (Id. at ¶ 16).  Although plaintiff asked defendant John Doe No. 3 for a complaint form, and he said he would look into it, plaintiff never saw any of the officers again.  (Id.).

Even if the Court construed plaintiff's allegations as stating that he sincerely believed that he required a kosher meal, and needed a copy of the Holy Quran and a towel to use as a prayer rug, plaintiff has not alleged that the alleged deprivation of these items substantially burdened his religious activities.  As the Court determined in its previous dismissal order, plaintiff has not alleged the extent of the purported restrictions on his religious activities.  It is, again, unclear whether plaintiff is alleging that he was denied a religious diet on a single occasion, on December 2, 2006, or during his entire stay in administrative segregation.  See Glover, 2007 WL 3022249, at *1 (failure to provide inmate with vegetarian meal in compliance with his special religious diet on a single occasion did not rise to the level of a constitutional violation).  Furthermore, plaintiff does not allege what response defendants made to his request for a Quran and towel, or that he made any other attempts to obtain a copy of the Quran or a towel, or some other item, to use as a prayer rug while in administrative segregation beyond his single request on December 2, 2006.  Nor does plaintiff set forth how long he remained without a Quran or an item to use as a prayer rug, and whether the deprivation was long enough to hinder his usual religious practices.

1   Plaintiff, therefore, fails to state a free exercise of religion claim against John Doe Nos.

2   3, 4, and 5.[2]  Plaintiff's First Amendment claim against John Doe Nos. 3, 4, and 5, therefore,

3   must be dismissed.

4   **V.     PLAINTIFF HAS SUFFICIENTLY PLEADED AN EQUAL PROTECTION CLAIM**

5        **AGAINST DEFENDANTS JOHN DOE NOS. 4 AND 5 AT THE SCREENING STAGE**

6        Plaintiff alleges that defendants violated his right to equal protection.  (See Second

7   Amended Complaint, Legal Claims, at 13).  The Equal Protection Clause of the Fourteenth

8   Amendment "is essentially a direction that all persons similarly situated should be treated alike."

9   City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  In order to state an

10  equal protection claim, a plaintiff must not only allege that he or she was similarly situated to

11  others who received different treatment, but that the different treatment was the result of

12  intentional unlawful discrimination based, at least in part, on a plaintiff's membership in a

13  protected class, or allege facts from which discriminatory intent may be inferred.  See Monteiro

14  v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1026 (9th Cir. 1998); Barren v. Harrington, 152

15  F.3d 1193, 1194 (9th Cir. 1998); Fraley v. Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993);

16  see Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  Cf. City of New Orleans v.

17  Dukes, 427 U.S. 297, 303 (1976) ("inherently suspect distinctions" include race, religion and

18  alienage); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1996) ("The Constitution's equal

19  protection guarantee ensures that prison officials cannot discriminate against particular

20  religions.  Prisons must afford an inmate of a minority religion 'a reasonable opportunity of

21  pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

22  conventional religious precepts.'" (citations omitted)), abrogated on other grounds by Shakur,

23  514 F.3d at 884-85.

24      Although plaintiff does not specifically identify which defendants against whom he

25  asserts his equal protection claim, plaintiff alleges that he informed defendants John Doe Nos.

26  _____

27      [2]  As the Court noted in its previous dismissal order, plaintiff's free exercise of religion claims are
properly asserted only against John Doe Nos. 3, 4, and 5.  Plaintiff does not allege that any named
28  defendant participated in the alleged violations.  See Taylor, 880 F.2d at 1045.

4 and 5 that he was a devout Muslim and required a kosher meal, or a peanut butter and jelly sandwich, because he did not eat meat, and that his central file established that he was a registered Muslim and had a special religious diet card.  (See Second Amended Complaint ¶ 14, Exh. E).  Plaintiff further alleges that defendants John Doe Nos. 4 and 5, nonetheless, brought plaintiff a meat meal tray and John Doe No. 4 spit in the food.  (See id. at ¶¶ 15-16).  Plaintiff also alleges that defendants failed "to follow California Department of Corrections policy and regulations."  (See Second Amended Complaint, Legal Claims, at 13).  Construing the allegations of the Second Amended Complaint in the light most favorable to plaintiff at this early pleading stage, plaintiff's allegations are sufficient to state an equal protection claim against defendants John Doe Nos. 4 and 5.

Plaintiff, therefore, may reallege his equal protection claim against John Doe Nos. 4 and 5 in his Third Amended Complaint.

## VI.   PLAINTIFF HAS FAILED TO PROPERLY STATE A CLAIM AGAINST DEFENDANTS T. COOK, D.L. ENGLAND AND B.G. DIEBALL

Here, plaintiff has not alleged acts sufficient to link the alleged violation of his rights to defendants Captain T. Cook, D.L. England and B.G. Dieball.  Plaintiff alleges that he appeared before the ICC on December 7, 2006, and was informed by defendant Captain T. Cook that plaintiff's cellmate had already told the staff at the CTF that plaintiff had nothing to do with manipulating his cell door locking bar mechanism.  (See Second Amended Complaint ¶¶ 17-19, Exhs. A, D).  Plaintiff alleges that he told defendant Cook that he never should have been transferred to CMC, had been transferred for something that his cellmate had done, he never had a chance to tell his side of the story or produce witnesses on his behalf, or give a written statement before he was transferred, he had been "taken out of place where I was programming," and had experienced shameful and inhumane treatment and had not been able to call his loved once since his transfer to CMC, only to be told that he had been cleared of all charges.  (Id. at ¶ 20).  With respect to plaintiff's lost legal papers, plaintiff alleges that defendant officer D.L. England told plaintiff to place his legal papers in a plastic bag and leave it on a bookshelf in his cell, and that his cell would be left open for three or four days until

1   plaintiff returned from back surgery.  (Second Amended Complaint at ¶¶ 22, 23).  Plaintiff

2   further alleges that defendant correctional sergeant B.G. Dieball denied plaintiff's first-level

3   appeal regarding his lost legal papers, and his requests for informal and formal level review

4   were bypassed.  (See id. at ¶ 43, Exhs. F, R).

5        As previously stated, a person "subjects" another to the deprivation of a constitutional

6   right within the meaning of Section 1983 if he or she "does an affirmative act, participates in

7   another's affirmative acts, or omits to perform an act which he [or she] is legally required to do"

8   that causes the complained-of deprivation.  Johnson, 588 F.2d at 743; see also Taylor, 880

9   F.2d at 1045.  Construing plaintiff's allegations liberally, plaintiff's allegations do not adequately

10  state a claim for relief under Section 1983 against defendants Cook, England and Dieball.

11  Plaintiff has not alleged that these defendants affirmatively acted, participated in another's act,

12  or omitted to perform an act that he or she was legally required to do.  See Leer v. Murphy, 844

13  F.2d 628, 633-34 (9th Cir. 1988) (in an action brought under 42 U.S.C. Section 1983, plaintiff

14  must establish causation, as by demonstrating the duties and responsibilities of defendant).

15  Plaintiff does not allege that defendant Cook was responsible for his transfer to CMC or was

16  otherwise responsible for, or involved in, any of the experiences of which plaintiff complained.

17  See Barren, 152 F.3d at 1194 ("A plaintiff must allege facts, not simply conclusions, that show

18  that an individual was personally involved in the deprivation of his civil rights."), cert. denied,

19  525 U.S. 1154 (1999); Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982) ("Vague and

20  conclusory allegations of official participation in civil rights violations are not sufficient.").

21       Nor does plaintiff allege that defendant England was responsible for ensuring the safe-

22  keeping of plaintiff's legal papers or that any constitutional deprivation resulted from defendant

23  Dieball's denial of plaintiff's first-level appeal.  As the Court noted in its previous dismissal order,

24  a prisoner cannot assert a due process claim based on the manner in which his grievances are

25  processed, nor hold the officials who processed his grievances liable for the violations that were

26  the subject matter of his administrative appeals.  See Ramirez v. Galaza, 334 F.3d 850, 860

27  (9th Cir. 2003) (no liberty interest in processing of appeals because inmates lack a separate

28  constitutional entitlement to a specific prison grievance procedure); Mann v. Adams, 855 F.2d

639, 640 (9th Cir. 1988) ("There is no legitimate claim of entitlement to a grievance procedure."); Stewart v. Block, 938 F. Supp. 582, 588 (C.D. Cal. 1996) ("The Constitution creates no entitlement to prison grievance procedures."); Meza v. California Dep't of Corrs., 2006 WL 1686608, at *5 (E.D. Cal. June 19, 2006) ("Actions in reviewing prisoner's administrative appeal cannot serve as the basis for liability under a § 1983 action."); Hannon v. Kramer, 2006 WL 1409710, at *3 (E.D. Cal. May 23, 2006) (dismissing Eighth Amendment claim against defendant who interviewed plaintiff concerning his inmate appeal); Smith v. Calderon, 1999 WL 1051947, at *3 (N.D. Cal. Nov. 10, 1999) (prison officials' alleged failure to properly process and decide inmate's administrative grievances did not violate any constitutional right).

Thus, plaintiff's claims against defendants Cook, England and Dieball must be dismissed.

**VII.   PLAINTIFF MUST NAME ALL DEFENDANTS IN THE CAPTION**

Plaintiff has named T. Cook as a defendant in the body of the Second Amended Complaint (Second Amended Complaint, Parties, ¶ 4; see id. at ¶¶ 17-20), but has failed to include his name in the caption. If plaintiff files an amended complaint, he must include in the caption the names of all the defendants against whom he is asserting a claim. See Fed. R. Civ. P. 10(a); Local Rule 11-3.8(d); see also Ferdik v. Bonzelet, 963 F.2d 1258, 1262-63 (9th Cir. 1992) (dismissing action for refusal to comply with court orders to name defendants in the caption). The Court will not order the United States Marshal to serve a complaint on any defendant not named in the caption.

* * * * * * * * *

Although it appears unlikely that plaintiff will be able to cure the deficiencies of the Second Amended Complaint by amendment, the Court will afford plaintiff one final opportunity to do so. See Noll, 809 F.2d at 1448. The Second Amended Complaint, therefore, is **DISMISSED WITH LEAVE TO AMEND**.

If plaintiff desires to pursue this action, plaintiff is **ORDERED** to file a Third Amended Complaint within thirty (30) days of the date of this Order, remedying the deficiencies discussed

above.  **Plaintiff may not add new claims or new defendants without obtaining prior leave of court.  Fed. R. Civ. P. 15(a).**

       If plaintiff chooses to file a Third Amended Complaint, it should bear the docket number assigned in this case; be labeled "Third Amended Complaint"; and be complete in and of itself without reference to the original complaint or any other pleading, attachment or document.  The Clerk is directed to provide plaintiff with a blank Central District civil rights complaint form, which plaintiff will need to completely fill out and resubmit.

       **Plaintiff is admonished that, if he fails to timely file a Third Amended Complaint, the Court will recommend that the action be dismissed on the grounds set forth above and for failure to diligently prosecute.**

DATED: January 5, 2009

                                     /s/
                                JENNIFER T. LUM
                                UNITED STATES MAGISTRATE JUDGE